IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BILLIE J. DANIEL                                                          PLAINTIFF

V.                            NO. 11-5205

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration              DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Billie J. Daniel, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claim for a period of disability and disability insurance benefits

(DIB) under Title II of the Social Security Act (Act).  In this judicial review, the Court must

determine whether there is substantial evidence in the administrative record to support the

Commissioner's decision.  See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff protectively filed his application for DIB on August 6, 2009, alleging an inability

to work since January 1, 2009,[1] due to "Vasculitis, small vessel ischemic disease, copd,

insomnia, stomach disease, chronic right hip and lower back pain."  (Tr. 173, 178).  An

administrative hearing was held on August 27, 2010, at which Plaintiff appeared with counsel

and testified.  (Tr. 28-82).  By written decision dated November 16, 2010, the ALJ found

Plaintiff had the following severe impairments: back disorder, mood disorder, vasculitis, and

chronic obstructive pulmonary disease (COPD).  (Tr. 12).  However, after reviewing all of the

--------

[1]Plaintiff's original onset date was January 1, 2005.  (Tr. 173).  However, at the hearing before the ALJ, Plaintiff
amended his onset date to January 1, 2009.  (Tr. 30).

AO72A
(Rev. 8/82)

evidence presented, he determined that Plaintiff's impairments did not meet or equal the level

of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart

P, Regulation No. 4. (Tr. 12).  The ALJ found that Plaintiff had the residual functional capacity

(RFC) to:

> lift and carry 20 pounds occasionally and 10 pounds frequently.  The
> claimant can sit for about 6 hours during an eight-hour workday and can
> stand and walk for about 6 hours during an eight-hour workday.  The
> claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl.
> The claimant is to avoid concentrated exposure to dusts, fumes, gases,
> odors, poor ventilation, and hazards, such as unprotected heights and
> heavy machinery.  The claimant can understand, remember, and carry out
> simple, routine, and repetitive tasks.    The claimant can respond
> appropriately to supervisors, co-workers, and usual work situations, but
> can have occasional contact with the general public.

(Tr. 14).  With the help of a vocational expert (VE), the ALJ determined Plaintiff would be

capable of performing work such as hand packager, mail clerk, and plastics worker.  (Tr. 19).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

denied that request on June 29, 2011.  (Tr. 1-4).  Subsequently, Plaintiff filed this action.  (Doc.

1). This case is before the undersigned pursuant to the consent of the parties.  (Doc. 4).  Both

parties have filed briefs, and this case is now ready for decision.  (Docs. 7, 8).

## II.    Evidence Presented:

Plaintiff was born in 1958 and completed the 8th grade in school.  (173, 183).  The 3,744

page transcript contains records dating as far back as 2001, indicating that Plaintiff suffered from

nausea and vomiting as early as 1979.  (Tr. 3,428).  For purposes of context, the Court will

summarize the medical records for years 2001 through 2008, as the relevant time period starts

on January 1, 2009.

AO72A
(Rev. 8/82)

In 2002, Plaintiff complained to the Veteran's Administration Hospital (hereinafter referred to as "VA") of abdominal and back pain. (Tr. 1,310). In 2003, Plaintiff complained to the VA of lower abdominal pain. (Tr. 3,341-3,342). Also in 2003, a colonoscopy was performed, revealing internal hemorrhoids. (Tr. 1,344). Plaintiff also suffered from shingles in 2003, as well as nausea and vomiting. (Tr. 1,452, 1,455, 3,412).

In 2004, Plaintiff suffered from GERD (gastroesophageal reflux disease), and an EGD (esophagogastroduodenoscopy) was performed, which revealed a hiatal hernia. (Tr. 625, 796, 1,343).

In 2005, Plaintiff was diagnosed by the VA with carpal tunnel syndrome. A splint was provided, after which his right wrist began feeling much better. (Tr. 604, 613). Plaintiff also complained that his hiatal hernia was bothering him. (Tr. 609, 1,391). Plaintiff underwent surgery in 2005 for a Nissen fundoplication.[2] (Tr. 642). It was noted that his nausea and vomiting had resolved and that Plaintiff smoked less than a pack of cigarettes per day. (Tr. 590). It was also noted that Plaintiff's hyperlipidemia was stable. (Tr. 591).

In 2006, Plaintiff complained to the VA of an upset stomach and depression. (Tr. 456, 462). Plaintiff maintained he had not been drinking alcohol. (Tr. 456). Also in 2006, Plaintiff complained of abdominal and testicular pain, and anger and impatience. (Tr. 254, 441, 446). In March of 2006, Plaintiff advised a doctor at the VA that he had stopped taking Wellbutrin, due to the side effects. (Tr. 444). In May of 2006, Plaintiff complained to the VA of having a

---

[2]Nissen - complete fundoplication; can be done through abdominal or thoracic approach; currently most often performed laparoscopically.

Fundoplication - Suture of the fundus of the stomach completely or partially around the gastroesophageal junction to treat gastroesophageal reflux disease; can be performed by open abdominal or thoracic operation, or a laparoscopic approach. Stedman's Medical Dictionary 777 (28th ed. 2006)

headache and chest pain. (Tr. 433). Plaintiff did not desire his chronic pain to be addressed at that time. (Tr. 438). Also in May of 2006, A CT of Plaintiff's head revealed the following:

> 1.   Ill-defined, nonenhancing areas of low density within the periventricular white matter and centrum semiovale bilaterally most likely secondary to periventricular white matter disease secondary to small vessel ischemic changes. 2. Tortuosity of the vertebral arteries.

(Tr. 851). An EKG was normal. (Tr. 430). In May of 2006, Plaintiff again presented to the VA with nausea and vomiting. (Tr. 427, 778). The pathology was done for an EGD, and it showed that Plaintiff had gastric mucosa[3] with focal gastritis and Helicobacter pylori[4] organisms were present. (Tr. 416). Plaintiff was smoking one pack of cigarettes per day at that time, and denied psychiatric problems with depression and anxiety. (Tr. 417-418). Plaintiff was admitted to the hospital. (Tr. 778). Radiology reports indicated no acute cardiopulmonary disease, postoperatic changes in the region of the gastroesophageal junction and lesser curvature, air filled loops of small and large bowel with no demonstration of bowel obstruction, free air or pneumatosis.[5] (Tr. 718). A CT of Plaintiff's head revealed the same as indicated above. (Tr. 719). A CT of Plaintiff's abdomen and pelvis was suspicious for gastric outlet obstruction or delay, diverticulosis with no inflammatory changes appreciated, intramuscular lipoma anterior to the right hip, and post surgical changes. (Tr. 720, 722). Plaintiff also complained to the VA in 2006 of pain in his left shoulder, radiating down to the arm. X-rays of Plaintiff's cervical spine

---

[3]Mucosa - A mucous tissue lining various tubular structures consisting of epithelium, lamina propria, and, in the digestive tract, a layer of smooth muscle (muscularis mucosae). Id. at 1233.

[4]Helicobacter Pylori - A bacterial species that produces urease and causes gastritis and nearly all peptic ulcer disease of the stomach and duodenum. Infection with this organism also plays an etiologic role (probably along with dietary cofactors) in dysplasia and metaplasia of gastric mucosa, distal gastric adenocarcinoma, and non-Hodgkin lymphoma of the stomach. Id. at 859.

[5]Pneumatosis - Abnormal accumulation of gas in any tissue or part of the body. Id. at 1522.

-4-

revealed mild disc space narrowing at C5-6 and C6-7.  (Tr. 848).

In 2007, Plaintiff again complained of nausea and vomiting, he was reported as an active smoker, his hyperlipidemia was mildly uncontrolled, he was diagnosed with adjustment disorder with depressed mood, and he experienced dyspnea on exertion.  (Tr. 392).  The medical report dated March 14, 2007, indicates that Plaintiff "randomly takes his meds."  (Tr. 394, 3,031).  It also indicated that Plaintiff was not suffering from depression.  (Tr. 394, 3,031).  In April of 2007, Plaintiff reported that Reglan helped his nausea, but that Prozac did not help his anger and irritability.  (Tr. 1,021).  Plaintiff was also diagnosed with COPD.  (Tr. 1,022).  Also in April of 2007, Plaintiff reported that he wanted to quit smoking, so he requested nicotine patches.  (Tr. 385).   X-rays of Plaintiff's chest revealed no acute findings.   (Tr. 714).   Plaintiff's hyperlipidemia was found to be stable on April 27, 2007, as was his adjustment disorder with depressed mood.  (Tr. 1,012).

In May of 2007, Plaintiff underwent an incisional hernia rectorectus repair surgery.  (1,532).  Also in May of 2007, Plaintiff reported that he was taking Celexa, and that it was helping.  (Tr. 349).  However, in June of 2007, Plaintiff presented himself to the VA and reported that he was not taking Celexa or Zocor.  (Tr. 308, 818).  It was reported that Plaintiff was not compliant with his medication, and was still an active smoker.  (Tr. 308-309,  818).  Plaintiff reported that he was not taking Celexa regularly because it made him feel "sluggish."  (Tr. 309).

Plaintiff was complaining of poor sleep and anger control in July of 2007, and reported that Citalopram was prescribed, but he took it irregularly.  (Tr. 302).  Plaintiff reported he was not taking his Celexa, and was not depressed, but was just aggravated all the time.  (Tr. 304).

-5-

In 2008, Plaintiff complained of flu-like symptoms and was diagnosed with Influenza/COPD exacerbation. (Tr. 292). X-rays of the chest revealed minimal central bronchial wall thickening, and no focal lung consolidation was seen. (Tr. 846). In July of 2008, Plaintiff reported that Trazodone was helpful with his sleep, and that the Combivent inhaler for COPD was helpful. (Tr. 282). Plaintiff reported bad side effects from the Chantix nicotine patches. (Tr. 280-281). In September of 2008, Plaintiff complained of exacerbated pain over his right hip and right lower back. (Tr. 276). Plaintiff reported taking ibuprofen and Tylenol, which were not helping. (Tr. 278). In October of 2008, Plaintiff requested medication for his "nerves." (Tr. 273).

In June of 2009, Plaintiff reported he was using hydrocodone for joint pain, and using his albuterol inhaler as needed. (Tr. 939). He stopped taking Citalopram, saying that he did not feel he needed it for anger control. (Tr. 939). He was still smoking at this time. (Tr. 939). The June 5, 2009 medical report indicates that Plaintiff was noncompliant with anti-depressants. (Tr. 947). Also in June of 2009, Plaintiff declined tobacco cessation program referral. (Tr. 268). Plaintiff reported acute exacerbation of chronic lower back pain in July of 2009, and received a steroid injection, along with hydrocodone and flexeril. (Tr. 932). Plaintiff reported having increased pain upon standing from sitting, or crouching, and when ambulating. (Tr. 933). A radiology report indicated that Plaintiff had L5-S1 degenerative disease. (Tr. 845). A VA report dated July 6, 2009, reports that Plaintiff was diagnosed with degenerative disc disease L5 spine, lumbosacral strain, with significant effects on usual occupation, decreased mobility, problems with lifting and carrying, lack of stamina, decreased strength, and lower extremity pain. (Tr. 1,901). Also in July of 2009, Plaintiff suffered a "black out" or memory loss of the day that

occurred when he sideswiped an eighteen wheeler truck.  (Tr. 926).  An MRI of his brain

revealed the following:

> Multiple T2 and flair hyperintensities in the supratentorial white matter
> most numerous and largest within the frontal lobes.  Findings are
> nonspecific however the differential includes a demyelinating process,
> vasculitis and advances small vessel ischemic disease.

(Tr. 823).  Doctors at the VA concluded that Plaintiff suffered with an episode of Transient

Global Amnesia (TGA),  where the symptoms typically lasted less than 24 hours.  (Tr. 830,

1502).  TGA is differentiated from stroke by the lack of other neurologic deficits.  (Tr. 830,

1,502).  This incident was the only one suffered by Plaintiff.

   An August 12, 2009 VA report indicates that Plaintiff was smoking marijuana and

drinking alcohol.  (Tr. 2,230).  At that time, Plaintiff was able to walk on his heel and toe, was

able to tandem, stand on one foot independently, and was absent the romberg sign.[6]  (Tr. 2,231).

His finger to nose and other cerebellar function was reported as normal.  (Tr. 2,231).  An EEG

performed on September10, 2009, was reported as normal.  (Tr. 2,223).  Plaintiff continued to

have headaches.  (Tr. 1,495).  On October 14, 2009, Plaintiff reported to the VA that he fell and

injured his right knee.  (Tr. 1,891).  X-rays of his knee were normal.  X-rays of his hips revealed

mild degenerative changes involving bilateral hip articulations, and no acute fracture-dislocation.

(Tr. 1,894).  He was diagnosed with a residual injury to his right knee.  (Tr. 1,895).  It was

reported that this would result in decreased mobility, problems with lifting and carrying,

decreased strength, and lower extremity pain.  (Tr. 1,895).

   On October 19, 2009, non-examining consultant, Dr. Ronald Crow, completed a Physical

---

[6]Romberg sign - When a patient, standing with feet approximated, becomes unsteady or much more unsteady with
eyes closed.  Open, it is a sign of proprioception loss.  Id. at 1771.

-7-

RFC Assessment, wherein he concluded that Plaintiff would be able to perform medium work, with certain limitations.  (Tr. 1,856-1,863).  Dr. Crow reviewed the medical records and found that they did not support Plaintiff's allegation of COPD and Vasculitis.  In making this finding, Dr. Crow explained as follows:

> **COPD (significant).** PFT's noted mild obstruction (4/07).  Other than smoking, longitudinal MER notes no pulmonary issues and lung exam normal (8/09).  **Comment:** No suggestion in longitudinal MER that claimant having any significant pulmonary issues.  Even factoring in age-related decline in pulmonary function since the (4/07) PFT's were done, it is unlikely the claimant has experienced debilitating decline in function in that period of time.   In the opinion of this consultant, further development not indicated.
> **Vasculitis**.  Work-up for same normal (9/09).
> **MER supports medium RFC.**

(Tr. 1863).

Plaintiff was laid off work in October of 2009, and requested anxiety pills from the VA. (Tr. 1,889).  On October 30, 2009, Plaintiff complained to the VA that he was "stressed", and the medical report indicates that Plaintiff was told to stop smoking "pot" because of his "distemper as well as because of neuronal loss." (Tr. 1,883).  Plaintiff was diagnosed as follows:

| | |
|---|---|
| Axis I: | Adjustment Disorder NOS (mixed depression/temper syndrome); Cannabis abuse, episodic; Methamphetamine dependence, in remission by history 2002 |
| Axis II: | No diagnosis |
| Axis III: | Allergic to morphine; white matter disease; chronic back hip/headache pain on narcotic; GERD/COPD/High lipids |
| Axis IV: | 4-severe - job loss/SSI denial/medical/pain |
| Axis V: | 65 in 12 months; 55 now |

(Tr. 1,883).  Also according to the report, anxiety increased the severity of Plaintiff's stomach problems, and he had a history of substance abuse (IV use with Crank), but had been clean for 10 years.  (Tr. 1,887).  In November of 2009, Plaintiff reported no acute pain, but did report

-8-

chronic pain.  (Tr. 1,878).  However, Plaintiff declined medication adjustments or other pain management interventions at that time.  (Tr. 1,878).  A November 16, 2009 medical report indicates that Plaintiff "continues to smoke pot," "two hits off of a pipe" per day.  (Tr. 1,874). It was noted that this contrasted with Plaintiff's report in the first meeting that "maybe" he smoked pot 1-2 days per week, and that on October 30 he did admit that before the August of 2009 MRI, he would smoke daily, a total of three joints per week.  Plaintiff reported that he cut back after the MRI because he was told the pot was causing brain cell death.  (Tr. 1,874-1,875). Plaintiff denied depression or short temper.  (Tr. 1,875).  In November of 2009, Plaintiff was tested for obstructive sleep apnea, and no evidence of sleep apnea was found.  (Tr. 2,658).

On December 7, 2009, non-examining consultant, Dr. Dan Donahue, completed a Mental RFC Assessment form.  (Tr. 1,933-1,936).  He found that Plaintiff was moderately limited in 4 out of 20 categories, and not significantly limited in 16 out of 20 categories.  (Tr. 1,935).  In a Psychiatric Review Technique form of the same date, Dr. Donahue found that Plaintiff had mild degree of limitation in restriction of activities of daily living, and moderate degree of limitation in difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace.  (Tr. 1,947).  He also found there was insufficient evidence of an episode of decompensation of extended duration.  (Tr. 1,947).

On January 6, 2010, Plaintiff admitted to the VA that he drank two beers over New Years.  (Tr. 2,135).  The medical report indicated that previously he denied a history of EtOH abuse, but on January 6, 2010, he admitted that for years he would get drunk and then get into fights with people.  (Tr. 2,135).  He reported having some legal problems relating to this.  The record also points out inconsistencies in Plaintiff's reporting of smoking pot.

-9-

> He stopped the pot around 11/16/09, stopping his "two hits off of a pipe" per day habit. (This amount contrasted with his report in the first meeting that "maybe" he smoked pot 1-2 days per week.) Recall that on 10/30/09 he did admit that before the 8/09 MRI he would smoke daily, a total of three joints per week. He cut back after the MRI because he was told the pot was causing brain cell death.

(Tr. 2,135). The report indicated that Plaintiff used methamphetamine for 7 years and quit around 2001 because "it was causing problems in the marriage." (Tr. 2,136). The report further stated that Plaintiff was at real risk for EtOH relapse "if he does not practice abstinence, but he does not seem worried about it." (Tr. 2,137). It was reported that a fair amount of time was spent discussing the risk of EtOH relapse with even minor dalliance with EtOH, and that Plaintiff did not seem very impressed. (Tr. 2,137). Plaintiff was referred for neuropsychological evaluation with the question of memory dysfunction. (Tr. 2,140).

On January 14, 2010, Dr. Christopher M. Bauer, Ph.D., Neuropsychologist, examined Plaintiff. (Tr. 1,955-1,959). Plaintiff reported to him that he felt angry a lot and that his wife often told him that he was irritable. (Tr. 1,955). Plaintiff denied any feelings of depression, and reported a history of sporadic alcohol abuse, a long-standing history of marijuana use (discontinued in November of 2009), and a 7-year history of methamphetamine use (discontinued in 2001). (Tr.1,955). Dr. Bauer estimated Plaintiff's intelligence to be in the average range. (Tr. 1,957). Dr. Bauer summarized his impression as follows:

> Plaintiff's neuropsychological test performance is indicative of generally mild impairment in mental flexibility, aspects of attention (e.g. divided attention and working memory), and aspects of verbal and visual memory skills (e.g. primarily initial learning and retention of new information). Of note is that he demonstrated intact performance on semantically-related memory tasks (i.e. those involving short stories) while he demonstrated impaired performance on memory tasks involving unrelated list words. Intact performance is observed on tasks measuring

-10-

rote attention skills, processing speed, speech/language skills, visual-spatial/visual - motor skills, and word-retrieval skills.  In the context of his predicted average range premorbid intellectual functioning, his cognitive impairments represent a mild decline from his previous baseline of cognitive functioning and are most consistent with a diagnosis of Cognitive Disorder Not Otherwise Specified.

The pattern of the neuropsychological results is consistent with what might be expected given the MRI and CT findings (i.e. white matter disease).  It is unclear if his history of drug and alcohol abuse are related to his generally mild cognitive impairments.  There is not test evidence suggestive of a cortically-based progressive dementing illness (*for example, Alzheimer's Disease).  Based primarily on the results of self-report emotional inventories, he appears to be experiencing mild depressive symptoms and moderate anxiety symptoms at the present time.

(Tr. 1,958).  Dr. Bauer diagnosed Plaintiff with Cognitive Disorder, NOS, and Adjustment Disorder with Mixed Anxiety and Depressed Mood.  (Tr. 1,959).

In February of 2010, Plaintiff requested medication for his "nerves."  (Tr. 2,133).  On March 3, 2010, Plaintiff and his wife met with Dr. Richard C. Heckmann, the psychiatrist at the VA who had been treating Plaintiff, and asked to change doctors.  In his report dated March 3, 2010, Dr. Heckmann noted Plaintiff's inconsistent statements regarding his alcohol abuse.  Dr. Heckmann also reported that he told Plaintiff that impulse control was impaired by pot use.  (Tr. 2,130).  He further told Plaintiff that unless he achieved an enduring abstinence from drugs and EtOH, any psychiatric intervention was unlikely to work.  (Tr. 2,130).  On March 4, 2010, a medical record indicated that Plaintiff had a urine drug screen positive for cannabis at his visit with Dr. Heckmann the day before and had a blood alcohol of 7.8 at one of Dr. Heckmann's visits.  (Tr. 2,120).

On March 4, 2010, Dr. George D. Patterson, one of Plaintiff's treating physicians at the VA, completed a Physical Medical Source Statement.  (Tr. 1,973-1,974).  He diagnosed Plaintiff

-11-

with degenerative joint disease, anxiety, depression, and a cognitive disorder.  (Tr. 1,974).  However, it is noteworthy that Plaintiff's mental impairments are outside the scope of Dr. Patterson's expertise.  Dr. Patterson further found that Plaintiff was very limited in his ability to function in the workplace.  (Tr. 1,973-1,974).  Dr. Patterson also completed a Physical RFC Assessment, Short Form, on March 4, 2010, wherein he concluded that Plaintiff could not sit for six hours in an eight hour work-day; could not sit/stand/walk in combination for eight hours in an eight hour work-day, and would require four or more unscheduled work breaks in an eight hour work-day due to physical restrictions.  (Tr. 1,975).

On March 23, 2010, Plaintiff reported to the VA that he did not see his current substance use as a problem, reporting that he used cannabis about once a month and had for about 6 years, had history of daily use for many years, had not used alcohol in years, and "may pop a pill on occasion when offered by a friend, still spends time with old meth friends." (Tr. 2,119).  It was reported that some of the effects of ongoing cannabis use was discussed, but that Plaintiff stated his use was very minimal "which seems to contradict to some degree earlier reports as noted in Dr. Heckmann[']s last mental health note."  (Tr. 2,119).

In April of 2010, Plaintiff called the VA, stating he was having increased pain, the hydrocodone was not working like it used to, and requested either methadone or oxycodone.  (Tr. 2,114).   Rather than changing the medication, the doctor reported increasing the dose of hydrocodone.  (Tr. 2,114).  Later in April of 2010, Plaintiff reported having instances of anger.  (Tr. 2,107).  Plaintiff reported he occasionally had a "couple shots" of wild turkey and occasional marijuana use.  (Tr. 2,107).

Plaintiff reported to the VA in May of 2010 that he was using hydrocodone for pain,

-12-

which was not working anymore, and that he was seeing Dr. Anton C. Petrash at the VA for his anger. (Tr. 2,103). On May 18, 2010, Plaintiff was prescribed Fluoxetine once weekly. (Tr. 2,092). Plaintiff admitted drinking alcohol to help calm himself down, and to "smoking a little pot and taking under the counter valium." (Tr. 2,096).

On June 22, 2010, Plaintiff reported to the VA that his back was hurting a lot and that the hydrocodone was not working. (Tr. 3,522). The medical record reflects that Plaintiff was persistent in seeking oxycodone or methadone instead of hydrocodone. Dr. Patterson indicated that he had reviewed the psychiatric notes and drug screen data, and viewed Plaintiff as having a strong potential for opiate abuse, so he declined to prescribe oxycodone or methadone. (Tr. 3,522).

On June 24, 2010, Dr. Petrash, who replaced Dr. Heckmann, completed a Mental RFC Assessment form. (Tr. 1,976). Dr. Petrash was to check the areas in which Plaintiff had no useful ability to function on a sustained basis, and Dr. Petrash checked all of the areas, stating that this was a chronic condition and would not improve. (Tr. 1,976).

On June 27, 2010, Plaintiff presented himself to the VA Hospital, complaining that he was anxious. (Tr. 3,493). His son reported that he awoke that day feeling angry, irritable, and "fedup with his pain and his memory loss." (Tr. 3,513). Plaintiff got into a verbal argument with his wife and pushed her down, and then fired a gun out the door of his home, aiming at the ground. (Tr. 3513, 3445). Plaintiff was admitted to the Medical Service Department at the VA hospital. (Tr. 3,445). Plaintiff reported that Dr. Petrash was trying to treat him with a very low dose of Prozac, increasing to 40 mg. (Tr. 3,445). Plaintiff was given a Global Assessment Functioning score of 35-50. (Tr. 3,447). Soon thereafter, Plaintiff demanded to leave, and this

-13-

decision was supported by his family.  (Tr. 3,479).  One of the doctors met with Plaintiff and advised the son that he recommended Plaintiff remain in treatment, but the son insisted he was going to take him home.   (Tr. 3,479).   At that time, the report indicates Plaintiff's "Gait/Transferring - 10- Weak."  (Tr. 3,481).

On July 12, 2010, Plaintiff's wife called the VA and reported that with the increase in Fluoxetine, Plaintiff had become mean.  (Tr. 3,474).  Three days later, Plaintiff presented to the VA with pain over the left side of his thorax, which began after a fall the prior week.  (Tr. 3,467). Chest x-rays revealed no acute findings and a hiatal hernia.  (Tr. 3,434).  On July 16, 2010, Plaintiff reported that he was taking Alprazolam and that it calmed him down.  (Tr. 3,459).  On August 19, 2010, Plaintiff reported to the VA that the Alprazolam helped him with his episodes. (Tr. 3,430).  Plaintiff's diagnosis at that time was as follows:

| | |
|---|---|
| Axis I: | Cognitive disorder NOS; insomnia; social anxiety |
| Axis II: | None |
| Axis III: | White matter vascular disease of brain |
| Axis IV: | "Unemployable b/o chronic physical and mental problems" |
| Axis V: | 60, Last GAF Score; 60 on June 24, 2010 by Petrash, Anton Cyril |

(Tr. 3,432).

## IV.   Discussion:

Plaintiff raises the following issues on appeal: 1) The ALJ erred by failing to consider Plaintiff's impairments in combination, and by failing to find the following impairments were severe - cognitive disorder NOS, insomnia, social anxiety, organic mood disorder, degenerative joint disease of the hip, GERD( gastroesophageal reflux disease) with nausea status post Nissen procedure, and hernia repair with abdominal pain; 2) The ALJ erred by failing to consider

-14-

Listings 1.00; 3.02; 12.02, and 12.06; 3) The ALJ erred in his RFC assessment; 4) The ALJ erred in discounting Plaintiff's subjective complaints; and 5) The ALJ's hypothetical question to the VE did not adequately set forth Plaintiff's limitations.  (Doc. 7).

> **A.    Impairments:**

In his decision, the ALJ recognized his duty to determine whether Plaintiff had a medically determinable impairment that was "severe" or a combination of impairments that was "severe" within the meaning of the regulations if it significantly limited an individual's ability to perform basic work activities.  (Tr. 11).  The ALJ found Plaintiff's severe impairments in this case to be back disorder; mood disorder; vasculitis, and COPD.  (Tr. 12).  The ALJ also concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing.  (Tr. 12).  Plaintiff suggests that the ALJ should have found that cognitive disorder NOS, insomnia, social anxiety, organic mood disorder, degenerative joint disease of the hip, GERD with nausea status post Nissen procedure, and hernia repair with abdominal pain, should have also been considered severe.

An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § § 1520(a)(4)ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § § 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to the severity standard.  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cri. 1989).

With respect to Plaintiff's musculoskeletal impairments, the ALJ addressed them

-15-

specifically and analyzed them in light of the medical evidence of record.  (Tr. 15).  The ALJ noted that Plaintiff suffered from mild disc space narrowing in the cervical spine and had been treated with a steroid injection, hydrocodone, and flexeril for his right hip and lower back pain. He also noted that Plaintiff suffered from degenerative disease at the L5-S1 level, and x-rays of the hips showed mild degenerative changes bilaterally.  Plaintiff continued to complain that the hydrocodone was not working, and wanted oxycodone or methadone.  However, based upon Plaintiff's history, Dr. Patterson declined his request.  In addition, in a report dated November 13, 2009, Plaintiff declined medication adjustments or any other pain management intervention. (Tr. 1,878).  This is inconsistent with allegations of disabling pain.  Plaintiff also has a history of "randomly" taking his medications, and in 2009 and 2010, continued to smoke a pack of cigarettes per day, smoked marijuana, drank until he was drunk, and occasionally took under the counter valium.  The fact that Plaintiff used a cane while ambulating is not convincing, as Plaintiff could not show that this was prescribed.    With respect to Plaintiff's hernia and GERD, Plaintiff has not shown how these would cause limitations in his functional ability to work.  In addition, with respect to Plaintiff's cognitive impairment, organic mood disorder, insomnia, and social anxiety, the ALJ limited Plaintiff to simple, routine, and repetitive work with only occasional contact with the general public.  Therefore, the ALJ accounted for his memory problems and his difficulty being around people.  Accordingly, the Court believes there is substantial evidence to support the ALJ's findings regarding severe impairments.

**B.     Listings:**

In one paragraph, Plaintiff contends that the ALJ failed to consider Listings 1.00, 3.02, 12.02, and 12.06, stating that the medical evidence, as well as Dr. Petrash's mental medical

-16-

source statement, show "that Plaintiff had for Listing 12.02 Organic Mental Disorders: loss of cognitive ability, memory impairment, disturbance in mood, emotional lability, and marked restrictions in activities of daily living (ADLs) and in social functioning; For Listing 12.04, anhedonia,[7] sleep disturbance, psychomotor agitations, thoughts of suicide with restriction in ADLs and in social functioning."

Plaintiff has the burden to prove that his impairments meet or equal all of the specified medical criteria in a Listing.   Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990).  As urged by Defendant, Plaintiff has failed to provide specifics with his argument and only lists symptoms that apparently show he meets or equals a Listing.  However, Plaintiff doe s not provide any specific cites to any objective evidence to support his allegations.  Plaintiff has failed to meet his burden in this regard, and the Court believes there is substantial evidence to support the ALJ's findings regarding his conclusions as to whether Plaintiff's impairments met or equaled the listings.

**C.     RFC Assessment:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a

---

[7]Anhedonia - Absence of pleasure from the performance of acts that would ordinarily be pleasurable.  Id. at 93.

AO72A
(Rev. 8/82)

medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

The ALJ found that Plaintiff was capable of performing light work with certain restrictions. He found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and that he was to avoid concentrated exposure to dusts, fumes, gases, odors, poor ventilation, and hazards, such as unprotected heights and heavy machinery.    He found that Plaintiff could understand, remember, and carry out simple, routine, and repetitive tasks, and could respond appropriately to supervisors, co-workers, and usual work situations, and could have occasional contact with the general public.

It is true, as Plaintiff argues, that the ALJ gave little credit to the opinions given by Plaintiff's treating physicians, Dr. George Patterson, in his Medical Source Statement, and Dr. Patrash's severely restrictive Mental RFC Assessment, stating they were not supported by the record. The ALJ also noted that Plaintiff had a history of not being entirely compliant in taking prescribed medications, which suggested that the symptoms may not have been as limiting as the Plaintiff alleged in connection with his application. In addition, up until the hearing date, Plaintiff continued to drink alcohol, smoke one pack of cigarettes per day, and smoked pot, after being counseled by doctors numerous times to quit. "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Brown v. Barnhart, 390 F.3d 535, 540-41 (8th Cir. 2004).

-18-

The ALJ gave "little credit" to Dr. Patterson's opinion, finding it inconsistent with the record which reflected routine and conservative treatment.  In addition, the Court notes that Dr. Patterson's opinion was for the time period beginning on March 4, 2010, and continuing.  The ALJ found that Dr. Petrash's mental RFC assessment was not supported by the record, and that Dr. Petrash had been treating Plaintiff for a short time.  The ALJ noted that Dr. Heckmann, who was Plaintiff's treating psychiatrist prior to Dr. Petrash, opined that Plaintiff's memory deficit and degree of cognitive dysfunction were "likely influenced by THC[8] and that without SA treatment any psychotropic treatment would look like a failure."  (Tr. 16).  Dr. Heckmann also noted Plaintiff's non-compliance with medications.  "A treating physician's opinion 'does not automatically control or obviate the need to evaluate the record as whole.'" Id. at 540 (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

The Court believes that the ALJ gave the appropriate weight to each of the medical experts who evaluated Plaintiff's condition, both physically and mentally, gave sufficient reasons for discounting the opinions of Plaintiff's treating physicians, considered the record as a whole, and accordingly, the Court believes there is substantial evidence to support the ALJ's RFC assessment.

**D.     Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints, including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating

---

[8]Tetrahydrocannabinois (THC) - The psychoactive isomers present in *Cannabis*, is isolated from marijuana.  Id. at 1967.

factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ May not discount claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ May discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

The ALJ addressed Plaintiff's daily activities, finding that he had mild restrictions.  On August 26, 2009, Plaintiff reported being able to take care of his personal hygiene, work from 8 until 5, take his medications and eat supper, and sleep.  (Tr. 207).  Although he reported that he had trouble putting on his socks and tying his shoes, he was able to take care of other personal hygiene matters.  (Tr. 208).  He was able to mow the yard with a riding mower and pick up his yard.  (Tr. 209).  He went outside most of the day and liked to be on the back porch in the evenings.  (Tr. 210).  He drove a car and shopped for food with his wife.  (Tr. 210).  He reported that he could walk 100 yards before needing to stop and rest, could pay attention, finish what he started, and was able to follow written and spoken instructions.  (Tr. 210-212).  The ALJ also discussed Plaintiff's non-compliance with his medications as well as his continued smoking, drinking alcohol, and use of marijuana.  In addition, Plaintiff often made inconsistent statements regarding his use of alcohol and marijuana, and the ALJ was warranted in giving Plaintiff's testimony less credibility.

The Court believes that, after reviewing the entire record, there is substantial evidence to support the ALJ's credibility findings.

-20-

E.      **Hypothetical Question to the VE:**

Plaintiff contends the ALJ did not adequately set forth Plaintiff's impairments in his hypothetical question to the VE.  The Court believes the hypothetical questions posed by the ALJ to the VE constituted substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a hand packager, mail clerk, and plastics worker.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

V.      **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff's benefits, and thus the decision is affirmed.  The undersigned further finds that the Plaintiff's Complaint is dismissed with prejudice.

DATED this 18th day of October, 2012.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)